# United States Court of Appeals
## For the First Circuit

No. 12-1451

STEPHEN ROSSETTI,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Dyk,[*] and Kayatta,
Circuit Judges.

Derege B. Demissie, with whom Demissie & Church, was on brief, for appellant.
Aditya Bamzai, Attorney, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, and Joseph F. Palmer, Attorney, were on brief, for appellee.

December 9, 2014

---

[*]Of the Federal Circuit, sitting by designation

**KAYATTA, Circuit Judge**.  Stephen Rossetti was convicted on federal criminal charges arising from a plot to rob an armored car depot in Eaton, Massachusetts.  Having exhausted his direct appeals, Rossetti now seeks collateral review on a petition for a writ of habeas corpus, arguing that he was denied his Sixth Amendment right to counsel and that the district court wrongly refused to modify his sentence after a state court vacated a prior state conviction that had been relied upon to increase his federal sentence.  We affirm the district court's denial of Rossetti's petition.

## I.  Background

In late 1998, Carmello Merlino and Anthony Romano formed a plan to rob an armored car depot in Eaton, Massachusetts.[1]  Shortly thereafter, Merlino recruited two other men, David Turner and his friend Rossetti.  As it turned out, Romano was an FBI informant who tape-recorded the meetings of the conspirators that he attended.  The conversations recorded on those tapes paint Rossetti as an enthusiastic participant in the robbery venture.  In eighteen conversations recorded by Romano, Rossetti provided detailed advice about how to conduct the robbery.  He explained how to secure masks without pulling out hair that could be used to identify the conspirators, explained how to tie the depot's guards

---

[1] Unless otherwise noted, the background facts set forth here are not disputed for purposes of this appeal.

to a pole so that they would choke if they tried to move, advised that the guards would resist violently, and suggested a way for the conspirators to remove video surveillance tapes without making clear that the robbery was an inside job.  Rossetti also promised to provide guns, police scanners, walkie-talkies, body armor, and a grenade, boasting that he had "all the hardware" needed for the robbery.  Rossetti said that, during the robbery, he would be "ready at the door watching for anyone to come . . . [c]ause if they come in I'm taking them down."  Finally, he asked to drive one of the getaway cars, saying that he would "like to drive one of them [vehicles] in case I gotta . . . smash guys out of the way or whatever."

On February 6, 1999, the conspirators met at a garage to finalize details for the robbery, which was planned for the next day.  Romano showed the others a stolen minivan to be used in the robbery, and Rossetti confirmed that he would bring weapons and other equipment for the heist.  The conspirators planned to meet again at the garage the next morning.  The FBI, in turn, planned to arrest them when they arrived.

At the appointed hour the next morning, Rossetti drove with Turner in Rossetti's car toward the garage.  FBI agents testified that Rossetti circled the meeting point in a "counter-surveillance manner."  Instead of stopping at the garage, Rossetti eventually drove to a parking lot where Turner's car was parked.

-3-

There, they transferred masks, gloves, weapons, bulletproof vests, and walkie-talkies to Turner's car. Rossetti and Turner then drove back to the garage, again appearing to check out the area. At that point, they drove off and, after a brief chase, were stopped and arrested. The FBI agents retrieved four duffle bags and four ski masks from the garage, and the other equipment from Turner's car.

Rossetti was eventually convicted on conspiracy and attempt to affect commerce by robbery in violation of 18 U.S.C. § 1951, carrying a grenade and firearms in relation to a crime of violence in violation of 18 U.S.C. § 924(c), and being a felon in possession of a grenade and firearms in violation of 18 U.S.C. § 922(g)(1). In convicting Rossetti, the jury rejected his defenses that Romano entrapped Merlino and thereby "vicariously entrapped" Rossetti, and that Rossetti withdrew from the robbery plan before he was arrested.

After his conviction, Rossetti was sentenced in December 2002 to 622 months in prison. In August 2006, we vacated that sentence in light of United States v. Booker, 543 U.S. 220 (2005). On remand, the district court, in August 2007, resentenced Rossetti to 622 months. We affirmed that sentence in October 2008. Rossetti's petition for certiorari was denied in January 2009. Rossetti v. United States, 555 U.S. 1158 (2009). Meanwhile, in August 2008, Rossetti filed a motion in Massachusetts state court for a new trial on a prior state conviction. In January 2010,

-4-

Rossetti filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, arguing that he received ineffective assistance of counsel in his federal trial, and should therefore be retried. After the state court vacated his prior conviction in February 2011, he amended his section 2255 petition to add an argument that the vacatur of his prior state court conviction entitled him to re-sentencing on counts five and six of his conviction. The district judge thereafter denied his petition but granted him a certificate of appealability on the sentencing issue. On appeal, we allowed his motion to expand the certificate of appealability to encompass both issues.

## II. Analysis

### A. Sixth Amendment Claims

Rossetti challenges his counsel's conduct at his trial on three main grounds, arguing that counsel: (1) wrongly deterred him from testifying by incorrectly advising him that, if he testified in his own defense, his testimony would undercut counsel's ability to suggest to the jury that Rossetti did not go all the way to the garage as planned because he was withdrawing from the conspiracy; (2) failed to impeach one of his own witnesses and to procure expert testimony concerning a cell phone call relevant to a government theory for why he may not have stopped at the garage the morning of the arrest; and (3) had a conflict of interest that denied Rossetti his Sixth Amendment rights. The district court

rejected these arguments, each of which Rossetti properly preserved,[2] and so "we review the district court's legal determinations de novo and the court's findings of fact for clear error." Parsley v. United States, 604 F.3d 667, 671 (1st Cir. 2010).

### 1. Counsel's advice not to testify

Rossetti's claim that he suffered prejudice as a result of erroneous advice by counsel centers on his defense that he withdrew from the conspiracy at the last moment before the aborted robbery. Rossetti claims that his counsel told him that his testimony would undercut counsel's ability to argue withdrawal, and for that reason Rossetti opted not to testify. He argues now that that advice was wrong, and that because he refrained from testifying, he lost a chance to support his withdrawal defense, and otherwise to enhance his case.

To prove such a claim based on the failings of defense counsel, Rossetti must demonstrate both: "(1) that 'counsel's performance was deficient,' meaning that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'; and (2) 'that the

---

[2] Rossetti did not raise these arguments in his direct appeal, but "[a] defendant can assert ineffective-assistance claims for the first time in a collateral motion made under 28 U.S.C. § 2255 and, in fact, that is the preferred procedure." United States v. Huard, 342 F. App'x 640, 642 (unpublished) (1st Cir. 2009) (citing Massaro v. United States, 538 U.S. 500, 504-05, 509 (2003)).

-6-

deficient performance prejudiced the defense.'" United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). In assessing the adequacy of appointed counsel, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," see Strickland, 466 U.S. at 689, finding deficiency only "where, given the facts known [to counsel] at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotation marks omitted). And, to establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. This review presents "mixed questions of law and fact" in which factual questions predominate and we therefore review largely for clear error. See Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012).[3] We begin our review by summarizing the testimony that Rossetti says he would have given.

First, Rossetti says that he only participated in the conspiracy out of fear that Merlino would kill him if he did not participate, and that his detailed advice to the other participants in the conspiracy about how to conduct the robbery was really an

---

[3] The district judge who heard Rossetti's petition also presided over his trial and so was in a good position to assess Rossetti's claims.

unsuccessful ploy to dissuade them from conducting it by demonstrating its difficulties.

Second, Rossetti states that after the meeting of the conspirators on the eve of the planned robbery he learned that two of them were heroin addicts, and that he then decided to withdraw from the conspiracy because of his "strong aversion to heroin addicts" who "can't be trusted." He claims that he communicated this decision to Turner, who passed along the news to Merlino, who, despite Rossetti's professed fears, eventually took the news well, and, instead of killing Rossetti, agreed to Rossetti's request for a face-to-face meeting the next day.

Third, Rossetti claims he visited his mother's house to deal with an electrical problem after telling Turner of his withdrawal. While he was there he says he told her that he had backed out of a business deal.

Finally, he says that the next morning when the FBI observed him circling the area of the garage, he claims he was actually searching for the minivan of which he had agreed to help Merlino dispose. Having failed to find the minivan, he then proceeded toward a restaurant where he had agreed to meet Merlino, coincidentally again passing the garage on his way there.

Being familiar with the entire record, the district court concluded that this withdrawal claim was "chimerical." Rossetti v. United States, CIV.A. 10-10151-RGS, 2012 WL 37177, at *4 (D. Mass.

Jan. 9, 2012). We agree. The notion that this enthusiastic and seasoned conspirator who claims to have been fearful of his colleagues withdrew the night before the robbery and then nevertheless showed up at the appointed site and time carrying (as promised) weapons, masks, gloves and other tools for the heist makes no sense at all. Rossetti's argument that he was simply on his way (at that precise time) to dispose of the minivan is itself a hard sell. More importantly, as Rossetti's trial counsel recognized, to dispose of the stolen minivan was to help the conspirators, not to abandon them to their own devices. Indeed, Rossetti's affidavit acknowledges that because the minivan's ignition switch was missing and "the steering wheel column housing was broken with many pieces missing" the minivan might have hindered successful execution of the robbery because "if it was seen by an outsider there was a high risk that they would think the minivan was stolen."

Because Rossetti does not dispute on appeal that he joined the conspiracy, "the law presumes that the conspiracy continued, and that he continued to participate, unless he makes 'an affirmative showing' that . . . he withdrew from it." United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 2009) (quoting United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002)). To succeed at a withdrawal defense Rossetti would have had to demonstrate that he "act[ed] affirmatively either to defeat or

disavow the purposes of the conspiracy" which he could have done either by making "a full confession to authorities," which he does not contend he did, or "communicati[ng] . . . to his co-conspirators that he ha[d] abandoned the enterprise and its goals." United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012) (internal quotation marks and citations omitted). It seems quite reasonable to think that testimony that he was helping his fellow conspirators dispose of a stolen vehicle, the presence of which might cause suspicion, would have foreclosed any attempt by counsel to argue that the failure to pull into the garage evidenced withdrawal from the conspiracy. Nor would evidence from his mother that he said he was backing out of a business deal have established the relevant disavowal, even if believed, in view of Rossetti's actual conduct.[4]

In short, taking the stand to spin such a fanciful yarn would not in our view have created a reasonable probability that the jury would buy it. Indeed (and perhaps this is what defense counsel had in mind), such testimony could have harmed Rossetti's standing before the jury. Moreover, by testifying, Rossetti would have opened himself up to cross-examination about his criminal history and every detail of his participation in the robbery.

---

[4] It also follows from this that, once Rossetti decided not to testify, trial counsel was not ineffective for failing to ask Rossetti's mother about Rossetti's comment when she testified because her answer, as Rossetti concedes, would have been inadmissible hearsay.

Rossetti alternatively argues that his testimony would have supported his entrapment defense. Once a defendant demonstrates that he is entitled to an entrapment instruction, the government may defeat that defense by "prov[ing] beyond a reasonable doubt either that there was no undue government pressure or trickery or that the defendant was predisposed." United States v. LaFreniere, 236 F.3d 41, 44-45 (1st Cir. 2001). Rossetti argues that his testimony would have been relevant on each prong. He would have testified that Merlino, with the government's knowledge, coerced him to join the conspiracy once he knew of it. And he says he would have demonstrated he was not predisposed to commit the robbery by testifying that he had not committed any crimes since the 1980s and was "living a law-abiding, addiction free, and family oriented life."[5]

Both arguments fail to fit the evidence in a way that would have made a different result reasonably probable. The recordings of Merlino consistently belied any such approach, much

_____

[5] Factors which may be considered when determining whether someone was predisposed to commit a crime include:

> (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement or persuasion offered by the Government.

United States v. Gamache, 156 F.3d 1, 9-10 (1st Cir. 1998).

-11-

less one known to the government. As we said in connection with Turner's appeal, "Merlino made it clear that he was making an offer to participate which Turner could readily decline. There was no hint of threats or any other undue pressure--simply the opportunity for a big score." Turner, 501 F.3d at 71. Rossetti's attempt to sell a story that Merlino-"off tape only"--dealt differently with him faced the further problem that the numerous tapes that did exist evidence that the gang had an enthusiastic participant in Rossetti. His claim that he was acting in an effort to eventually convince everyone that the robbery was too hard simply does not fit either the script he was writing or the fact that he was supplying important resources for accomplishing the robbery. As for the matter of predisposition, the prior record of a robbery conviction, even though dated, combined with the tape recordings and the acts on the morning of the planned robbery made a long shot out of any effort to convince a jury that he had no predisposition to commit the crime. The withdrawal story Rossetti now says he wanted to tell, moreover, directly undercuts his claim that he was so fearful of Merlino that he felt compelled to commit the crime.

Lastly, Rossetti seems to argue that because counsel's allegedly erroneous advice caused him to surrender his right to testify, he might still prevail even if he cannot satisfy Strickland's requirement that any error have been reasonably likely to account for the verdict. None of our authority supports this

claim.  See Palmer v. Hendricks, 592 F.3d 386, 397 (3d Cir. 2010) ("[E]very authority we are aware of that has addressed the matter of counsel's failure to advise a client of the right to testify has done so under Strickland's two-prong framework."); Owens v. United States, 483 F.3d 48, 57-59 (1st Cir. 2007) (applying Strickland where counsel allegedly failed to inform the defendant of his right to testify); Cannon v. Mullin, 383 F.3d 1152, 1170 (10th Cir. 2004) ("Other courts also treat [right to testify] claims as ineffective assistance claims. . . .  We agree that Mr. Cannon's claim is best treated as an ineffective-assistance-of-counsel claim and analyze it as such.") (citing United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992) (en banc)).

Finally, we do concede that the logic of the foregoing actually helps Rossetti's argument in one sense:  the palpable weakness of the withdrawal and entrapment defenses undercut the notion that preserving those defenses was a reason not to testify. While we nevertheless tend to see the wisdom in Rossetti's not testifying given the cross-exam he would have faced based on his record and the tapes, we need not defend counsel's advice in order to reject Rossetti's Strickland argument.  Simply put, the proposed testimony would have fallen far short of breathing enough plausible life into those defenses to have created a reasonable possibility that they would have succeeded.  Rossetti's argument regarding the advice not to testify therefore fails.

-13-

## 2.    The cell phone evidence

Rossetti next argues that his counsel wrongly failed to impeach Rossetti's own witness when she gave erroneous testimony that was actually favorable to Rossetti's theory about his motivation on the day of his arrest.  When arrested, Rossetti was carrying a cellphone that the government suggested at trial he could have used to call his co-conspirators.  Such a call could explain why he did not go to the garage where he had agreed to meet them but instead surveilled and continued past it.  At trial, Rossetti called a witness who testified that the company that employed Rossetti, and that paid for the phone, was charged for no calls on Rossetti's phone that morning, thereby counteracting the government's theory.

The witness also testified, erroneously according to Rossetti, that the company would have been billed for a call even if Rossetti had called someone else but the call had not been answered.  The jury, Rossetti claims, "knew from their collective common sense that Rossetti was conveying erroneous information regarding cellular billing practices and, hence, found Rossetti's defense less credible."  If cellular phone billing practices were such common knowledge, however, it seems unlikely that the government attorney, Rossetti, his counsel, and the witness would all have failed to notice the witness's mistake.  Moreover, what Rossetti claims was a mistake actually benefitted Rossetti by

negating any suggestion that he even tried to call his co-conspirators. This mistake was unchallenged on cross or in closing by the prosecutor, and one can only imagine what Rossetti would have said had his counsel flagged it. In short, Rossetti has not come close to demonstrating that his counsel was ineffective by failing to impeach his own witness.

Alternatively, Rossetti argues that his trial counsel should have retained an expert who might have been able to ascertain that the phone was never used the morning of the arrest, and that the FBI may have tampered with it. And Rossetti complains that the district court should have allowed him to do discovery to explore this theory. The simple answer is that whether Rossetti (who often advised his fellows on the need to be careful) learned by a phone call on the morning of the planned robbery that something was amiss, or instead suspected there was a problem for other reasons, was not important to the government's case. And, as we have explained, Rossetti's actual undisputed conduct rendered his withdrawal defense too farfetched to serve as the basis for showing a causal connection between counsel's alleged failures and prejudice to Rossetti.

### 3. Counsel's purported conflict of interest

Rossetti's next argument is even more convoluted. He speculates that the FBI wanted to entrap him in order to gain leverage over his uncle, said by Rossetti to be a person of

interest in the investigation of the theft of artworks from the Gardner Museum. To uncover this motive, Rossetti wanted his trial counsel to interview and call as a witness a suspected FBI informant named Richard Chicofsky who, Rossetti suspected, might supply or point to evidence supporting the hypothesized entrapment motive. Rossetti's trial counsel, says Rossetti, failed to do this because, according to Rossetti, counsel had a business relationship with Chicofsky (a deal to split reward money offered by the Gardner Museum).

The simple answer to this argument is that, as we observed in deciding the appeal from Turner's conviction, the FBI's possible motive to entrap a person is of no moment in a case such as this one where there is predisposition and no evidence of improper inducement. United States v. Turner, 501 F.3d 59, 74 (1st Cir. 2007). Therefore, even if trial counsel had a conflict that caused him not to pursue the Gardner Museum motive for entrapment theory, the "failure" to pursue a defense that could not have succeeded could have caused no prejudice. Adding belt-to-suspenders, the district court found that "there was no likelihood that Chicofsky would have testified" because, among other reasons, when called in proceedings related to Turner's conviction, he invoked his Fifth Amendment right not to testify. See Rossetti, 2012 WL 37177, at *6.

In sum, we cannot say that there is a reasonable probability that the perceived shortcomings of Rossetti's counsel -- either individually or cumulatively -- affected the result in this case.[6] As already discussed, Rossetti's withdrawal theory is implausible, and so too is the notion that any of the tactics Rossetti now says his counsel should have adopted would have strengthened his defense.

## B. Rossetti's Challenge to his Sentence

Rossetti seeks to modify his sentence based on his successful vacatur of a prior state conviction for breaking and entering. That state conviction was one of three prior convictions the district court considered when calculating Rossetti's sentence. See Rossetti, 2012 WL 37177, at *6. "[A] defendant given a sentence enhanced for a prior conviction is entitled to a reduction if the earlier conviction is vacated," so long as he seeks re-sentencing in a timely manner. Johnson v. United States, 544 U.S.

---

[6] Similarly, the district court did not err in denying Rossetti an evidentiary hearing on his ineffective assistance claims. The district court assumed that Rossetti would have testified as he claimed, and found that it "would have added nothing by way of support for [his] withdrawal theory," which in any event was a "chimerical fantasy." Rossetti, 2012 WL 37177, at *4. As for the conflict of interest allegation, the district court found that Chicofsky "had nothing to contribute to Rossetti's defense." Id. at *6. See United States v. Rodriquez, 929 F.2d 747, 749-50 (1st Cir. 1991) (stating that "a [section 2255] petition can be dismissed without a[n] [evidentiary] hearing if the petitioner's allegations . . . 'are contradicted by the record, inherently incredible, or conclusions rather than statements of fact'") (quoting Dziurgot v. Luther, 897 F.2d 1222, 1225 (1st Cir. 1990)).

295, 303 (2005); see also Daniels v. United States, 532 U.S. 374, 382 (2001) ("If [a] challenge to [an] underlying conviction is successful, the defendant may then apply for reopening of his federal sentence."). At all times relevant to this opinion, the timeliness of Rossetti's petition was governed by 28 U.S.C. § 2255(f) which now (in materially unchanged structure) reads as follows:

> (f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of--
>
> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Rossetti's judgment of conviction in his federal case became final on January 26, 2009, the day on which his petition for certiorari was denied. In re Smith, 436 F.3d 9, 10 (1st Cir. 2006). Because Rossetti's state court conviction was vacated in February 2011, he did not seek to amend his habeas petition to add an argument that his sentence should therefore be modified until

April 2011, so he cannot rely on § 2255(f)(1). Rossetti does not seek to rely on subsections (f)(2) or (f)(3), so that leaves him to rely on subsection (f)(4) by arguing that he could not have discovered the facts underlying his motion until after April, 2010.

To satisfy subsection (f)(4)'s requirement that he could not "have discovered the facts through reasonable diligence" until less than a year before the petition was filed a petitioner must show that he acted with "due diligence" to set a prior conviction aside once he was "in a position to realize that he has an interest in challenging the prior conviction." Johnson, 544 U.S. at 308-09. In Johnson, the Supreme Court ruled that such a realization triggering the duty to act with diligence occurs upon the entry of a judgment in the federal criminal proceeding. Id. The Court reasoned that when judgment is entered a defendant surely knows that the prior state court conviction may be used to justify a sentence longer than the sentence that might be imposed but for the prior conviction. Id.

Rossetti's original judgment of conviction in federal court was entered on the docket on November 27, 2002.[7] He did not make a filing in state court seeking to set aside his conviction until August 2008. Under Johnson, his effort to rely on § 2255(f)(4) to justify a belated motion to reopen his sentence

---

[7] In a criminal case, a judgment includes, and therefore comes after, "the plea, the jury verdict or the court's findings, the adjudication, and the sentence." Fed. R. Crim. P. 32(k)(1).

-19-

should therefore fail. Rossetti nevertheless raises three arguments why this should not be so in his case.

First, Rossetti argues that the relevant "judgment" is not his original sentence, but instead the new judgment entered by the district court after we vacated his original sentence pursuant to Booker. This argument, however, is again precluded by Johnson, which considered and rejected, as delay-inducing, the argument that due diligence should not be required until a defendant's final appeal is concluded. Id. at 309. Here, Rossetti is arguing, in essence, that, whether one need diligently seek vacatur of a conviction as soon as one's federal judgment is entered remains unknown until the appeal is eventually decided, retroactively triggering such a duty only if the decision is to affirm. Such a rule cannot be squared with Johnson's desire to identify a "particular time" when the diligence requirement begins. Id. at 308.[8]

Second, Rossetti argues that, even if the diligence requirement normally would have begun at the time of his first judgment, he was not then in "a position to realize that he ha[d] an interest in challenging the prior conviction," id., because, prior to Johnson, this circuit's rule was that vacatur of a conviction was not a "fact" under (f)(4), see Brackett v. United

_____

[8] This is not a case in which only the final judgment vested the prior conviction with materiality.

-20-

States, 270 F.3d 60, 68 (1st Cir. 2001). While we doubt that the logic of this argument is correct,[9] the simple answer is that even if the diligence requirement did not begin until Johnson was decided in April 2005, Rossetti still waited three and a half years (until August 2008) to challenge his conviction, longer than the delay the Court found to be non-diligent in Johnson.

Moreover, even if Rossetti reasonably believed that (f)(4) was not open to him at the time of judgment, at that time, and for eight years thereafter, he still had an "interest in challenging the prior conviction" because, if he had done so successfully within one year of his final cert petition being denied in January 2009, he would have been able to timely file a motion to vacate his sentence under § 2255(f)(1), regardless of how § 2255(f)(4) was interpreted. In this respect, any incorrect belief that (f)(4) was unavailable gave even more reason to act promptly once he was sentenced in December 2002. He therefore had an "interest in challenging the prior conviction" even before Johnson was decided.

---

[9] The Supreme Court was fully aware of the interpretation that the First Circuit (and others) had made of section (f)(4) and did not suggest that the limitation period should start to run later in those circuits. See Johnson, 544 U.S. at 302 (citing Brackett, 270 F.3d at 60). The Eleventh Circuit, where Johnson brought his case, had not taken a position on whether vacatur of a conviction could be a fact under § 2255(f)(4) prior to his case, see Johnson v. United States, 340 F.3d 1219, 1222-26 (11th Cir. 2003), and yet the Court did not consider this at all when determining whether Johnson had exercised due diligence. See Johnson, 544 U.S. at 311.

-21-

Third, reaching again into his quiver of Strickland arguments, Rossetti argues that he raised the possibility of seeking to vacate his conviction to his counsel but that his counsel advised him he was unlikely to succeed. Johnson, however, itself rejected the argument that a defendant's lack of diligence in seeking to vacate his state conviction could be excused by the fact that he was unrepresented, reasoning that the Court had "never accepted pro se representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness." Johnson, 544 U.S. at 311. We cannot see how procedural ignorance by counsel would call for a different balance. Cf. Trapp v. Spencer, 479 F.3d 53, 60 (1st Cir. 2007) (rejecting the argument that attorney error normally justifies equitable tolling of the limitations period on habeas petitions where the error is not "egregious" and the sentence is not death).

For these reasons we conclude that the district court correctly determined that Rossetti's petition for resentencing was untimely.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

So ordered.

-22-