UNITED STATES of America,

v.

Matthew D. WEST, Defendant.

Criminal Action No. 06–10281–WGY.

United States District Court,
D. Massachusetts.

May 7, 2008.

John T. McNeil, United States Attorney's Office, Boston, MA, for United States of America.

*SENTENCING MEMORANDUM*[1]

YOUNG, District Judge.

## I. INTRODUCTION

Given the multi-page judgment and statement of reasons form, AO 245B Judgment in a Criminal Case (05–MA)(Rev.06/05), the written explanations required therein, augmented by the transcript of the detailed explanation rendered in open court of each criminal sentence imposed, I write sentencing memoranda rarely—usually only when remarkable facts or an especially knotty legal question requires such disciplined analysis.

This is not such a case.

1. The Court is well aware of the First Circuit's recent discussion advising against belated, post-appeal sentencing memoranda. *United States v. Martin*, 520 F.3d 87, 98 (1st Cir.2008). No appeal has been filed in this case, and the Court believes it has acted *"expeditiously so as to avoid interference with either the appellate process or the parties' rights." Id.* at 98.

Here, the derivation of the particular sentence imposed is fairly straight forward. Nevertheless, as the consequences of disparagement and delay evident in this case so well demonstrate two particularly unfortunate and persistent artifacts of that now thoroughly discredited oxymoron—mandatory guidelines—a decent respect for sentencing consistency requires that I frankly admit my own complicity in such unfortunate persistence and explain how my institutional approach to criminal sentencing has evolved.

## II. PROLOGUE: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury"—U.S. Const. art. III, § 2, cl. 3.

With this simple language, the United States became the only nation in the history of the world to make constitutional officers of those ordinary citizens called to serve on the nation's juries. To succeed, this stunning experiment in direct democracy called forth the development of a professionalism in our trial judiciary that, over the course of two centuries, evolved into a system of precise, even-handed fact finding which, in turn, undergirds the entire concept of judicial independence and trial judge constitutional interpretation. *See* ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 337–39 (Schocken 1st ed.1961) (1835); Michelle D. Beardslee & William G. Young, *The Eclipse of Fact Finding: It Foreshadows the Twilight of Judicial Independence* (forthcoming 2008).

## III. THE PAST: The Oxymoron of Mandatory Guidelines

Twenty-one years ago, the Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat. 1837, 1987–2040 (1984) (amended 1990, 1998), took effect—an unconstitutional statute that strikingly marginalized the constitutional fact-finding function of America's juries, pervasively impaired that crown jewel of America's doctrine of separation of powers—independent fact finding by juries within the judicial branch, and severely undermined the very bedrock of our Constitution, judicial independence.

No one realized this at the time, of course. Indeed, during my own confirmation hearing in 1984, I testified honestly to the Senate Judiciary Committee that, overall, I considered sentencing guidelines worthwhile. When they were enacted by bipartisan majorities in the Congress, there was no judicial outcry or institutional resistance. I well recall the teaching of now Justice Stephen Breyer, who was then a judge in the First Circuit and a Sentencing Commissioner, that the guidelines were just that, guidelines, and judges were free to depart based on reasoned, individualized analysis. *See United States v. Rivera*, 994 F.2d 942, 947–49 (1st Cir.1993) (discussing how guidelines structure sentencing judges' decision-making); Stephen Breyer, *The Federal Sentencing Guidelines and Key Compromises on Which They Rest*, 17 HOFSTRA L. REV. 1, 5–6, 18 (1988). I remember thinking that he made a lot of sense and, considering that he had served as counsel to the Senate Judiciary Committee during the drafting of the guidelines legislation, he probably had it right.

Unfortunately, realization of the Breyer vision has been a long time coming.

In actuality, save in the Second Circuit which developed a strong departure jurisprudence, the "guidelines" quickly ossified into a relatively strict sentencing code. *See* Lisa M. Farabee, *Disparate Departures Under the Federal Sentencing Guidelines: A Tale of Two Districts*, 30 CONN. L.REV. 569, 591–92 (1998) (noting Second Circuit trend); *see also United States v. Sklar*, 920 F.2d 107, 109, 114–117 (1st Cir.1990) (discussing nature of depar-

ture and reason for reversing it); *United States v. Studley*, 907 F.2d 254, 257–60 (1st Cir.1990) (discussing same); *United States v. Williams*, 891 F.2d 962, 967 (1st Cir. 1989) (summarizing improper departure). Having become a sentencing code, the "guidelines" worked poorly, focusing judges on apparently arbitrary distinctions that had little to do with genuine culpability. *See United States v. Burke*, 999 F.2d 596, 599–602 (1st Cir.1993) (discussing what constituted marijuana "plant"); Steven G. Kalar & Jon M. Sands, *An Object All Sublime: Let the Punishment Fit the Crime;* Champion, Mar. 2008, at 20, 24 (noting 100:1 crack-cocaine disparity). It became apparent that the government's charging decision had more to do with the sentence ultimately imposed than the jury's fact finding. *See United States v. Watts*, 519 U.S. 148, 149–151, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam) (discussing connection between charges defendants faced and sentences imposed). In fact, so unworkable did a mandatory guidelines system become, that in significant areas along America's borders, it was simply abandoned under a "fast track" euphemism to permit handling large volumes of cases. *United States v. Green*, 346 F.Supp.2d 259, 276–77 (D.Mass.2004), *vacated in part sub nom. United States v. Yeje–Cabrera*, 430 F.3d 1 (1st Cir.2005), *and vacated and remanded sub nom. United States v. Pacheco*, 434 F.3d 106 (1st Cir.2006). Even more devastating, imposition of mandatory guidelines came to be based on faux facts largely presented by the executive without the constitutional guarantee of confrontation or other evidentiary safeguards. *Green*, 346 F.Supp.2d at 278–79. Indeed, judges frequently found themselves reduced to little more than automatons, imposing a sentence as to which they had little or no input whatsoever. *Id.*

This resulted in a rising chorus of criticism, especially among district court judges, who were virtually unanimous in condemning mandatory "guidelines" that had become barriers to justice rather than channels to a fair individualized result. Jose A. Cabranes, *Sentencing Guidelines: A Dismal Failure*, 2/11/92 N.Y.L.J. 2, 2 (col.3) (1992); Lawrence K. Karlton, *Commentary*, 4 Fed. Sent'g Rep. 186, 186–87 (1991); William W. Schwarzer, *Judicial Discretion in Sentencing*, 3 Fed. Sent'g Rep. 339, 341 (1991); Ellsworth A. Van Graafeiland, *Some Thoughts on the Sentencing Reform Act of 1984*, 31 Vill. L.Rev. 1291, 1293–94 (1986); Joseph F. Weis, Jr., *The Federal Sentencing Guidelines—It's Time For a Reappraisal*, 29 Am.Crim. L.Rev. 823, 823, 825–6 (1992); Morris E. Lasker, U.S. District Judge for the Southern District of New York, Remarks Before Symposium on Sentencing Guidelines (Sept. 9, 1997), *available at* http://www.november.org/dissenting opinions/Lasker.html/; *see generally* Gerald W. Heaney, *The Reality of Sentencing Guidelines: No End to Disparity*, 28 Am. Crim. L.Rev. 161 (1991). Vainly did the courts of appeal exhort that mandatory guidelines were a "clarion call" to which the district judges, like old war horses, owed unstinting obedience; more recently, one grumbled that the district judges were conducting a "guerilla war" against the guidelines. *United States v. Jackson*, 30 F.3d 199, 204 (1st Cir.1994) (indicating courts are bound to follow clear legislative policy); *see Richardson v. United States*, 477 F.Supp.2d 392, 404 n. 14 (D.Mass.2007) (noting court of appeals judge's reaction to district court judges' sentencing practices).

Mandatory guidelines gave rise to an explosion of executive power to control the criminal justice system and it was not lost on the Congress that, if federal judges could be weaned away from the independence of jury fact-finding, they could be more easily controlled and made to do

Congress' bidding in specific cases. GEORGE FISHER, PLEA BARGAINING'S TRIUMPH 210–15 (2004) (discussing shift of power away from judiciary under guidelines); *see* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681, 1723–24 (1992) (detailing how prosecutors can affect sentences); Orrin G. Hatch, *The Role of Congress in Sentencing: The United States Sentencing Commission, Mandatory Minimum Sentences, and the Search for a Certain and Effective Sentencing System*, 28 WAKE FOREST L.REV. 185, 191–92 (1993) (commenting on shift of power and Congress's role). The passage of the notorious Feeney Amendment, Pub.L. No. 108–21, Title IV, 117 Stat. 650, 667–676 (2003), with its case specific reporting requirements, made palpable the assault on the judiciary as a separate and independent branch of government. *United States v. Kirsch*, 287 F.Supp.2d 1005, 1006–07 (D.Minn.2003); *see United States v. Grigg*, 442 F.3d 560, 565–66 (7th Cir.2006) (summarizing district court's comments about Feeney Amendment during sentencing procedure); *United States v. Khan*, 325 F.Supp.2d 218, 233 (E.D.N.Y.2004) (discussing criticisms of Feeney Amendment); Douglas A. Kelley, *Minnesota Federal Judge Caught in a Constitutional Crossfire*, 27 HAMLINE L.REV. 427, 444–45 (2004) (noting Judge Magnuson's discussion of intimidation of the judiciary); David M. Zlotnick, *The War Within the War on Crime: The Congressional Assault on Judicial Sentencing Discretion*, 57 SMU L. REV. 211, 233–36 (2004) (describing reaction of judges to Feeney Amendment).

My personal "sad epiphany" occurred when it became apparent that, notwithstanding long standing precedent that one would have thought prevented undue burdening of the Sixth Amendment right to trial by jury, the First Circuit actually and knowingly embraced a system where one set of "facts" could be utilized to sentence an offender who went to trial, but an alternate reality applied to an equally culpable co-defendant who had pleaded guilty. U.S. Const. amend. VI; *United States v. Thurston*, 358 F.3d 51, 78 (1st Cir.2004) (mandate stayed); *United States v. Rodriguez*, 162 F.3d 135, 150–153 (1st Cir.1998), *cert. denied*, 526 U.S. 1152, 119 S.Ct. 2034, 143 L.Ed.2d 1044 (1999) (discussing challenge to plea bargaining tactics); *see Green*, 346 F.Supp.2d at 278 (noting "swallowing the gun" tactic, in which prosecutor hides evidence from the sentencing judge if defendant pleads guilty but regurgitates it where the plea deal fell through said to be "flat-out illegal"). "If facts make no difference", I thought, "then 'judging' contributes nothing" and I considered it my duty to speak out. *Green*, 346 F.Supp.2d at 278–79 (criticizing *Thurston*); *Berthoff v. United States*, 140 F.Supp.2d 50, 64–67 (D.Mass.2001) (criticizing *Rodriguez*). My language—while accurate—was pointed and strong, consistently and publicly disparaging mandatory guidelines. *See* William G. Young, *Vanishing Trials, Vanishing Juries, Vanishing Constitution*, 40 SUFFOLK U.L.REV. 67, 74 (2006) [hereinafter Young, *Vanishing Trials*]; William G. Young, *An Open Letter to U.S. District Court Judges*, THE FEDERAL LAWYER, Jul. 2003, at 30; Hon. William G. Young, Speech at 54th Spring Meeting of American College of Trial Lawyers 3 (Mar. 6, 2004).

On June 18, 2004, this Court declared the United States Sentencing Guidelines unconstitutional, a decision widely reported. *Green*, 346 F.Supp.2d at 289–90; *see United States v. Detwiler*, 338 F.Supp.2d 1166, 1178 (D.Or.2004); *United States v. King*, 328 F.Supp.2d 1276, 1280 n. 9 (M.D.Fla.2004).

## IV. THE PRESENT: Supreme Court Pushes Back

In actuality, the death knell of mandatory guidelines had already sounded. In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held unequivocally "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. Mandatory guidelines based on some non-jury calculation of non-evidentiary submissions are simply incompatible with this holding, as Justice Breyer recognized immediately foretold. *See id.* at 556–558, 120 S.Ct. 2348 (Breyer, J., dissenting) (discussing—unfortunately erroneously—the need for judges in sentencing due to plethora of aggravating and mitigating factors). After *Apprendi*, the days of mandatory guidelines were numbered. And so it came to be, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), invalidated Washington's mandatory guideline system, a system constitutionally indistinguishable from the federal sentencing guidelines. In *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court finally declared the federal sentencing guidelines unconstitutional for marginalizing the jury's fact-finding function but, oddly, concluded that the statute could be saved by rendering it advisory. 543 U.S. at 225–244, 125 S.Ct. 738 (constitutional *Booker*); *id.* at 244–268, 125 S.Ct. 738 (remedial *Booker*).

The disjunct between constitutional and remedial *Booker* has been extensively discussed elsewhere. *United States v. Henry*, 472 F.3d 910, 918–19 (D.C.Cir.) (Kavanaugh, J., concurring), *cert. denied*, — U.S. —, 128 S.Ct. 247, 169 L.Ed.2d 147 (2007); *United States v. Smith*, 253 Fed. Appx. 841, 842–45 (11th Cir.2007); *United States v. Cage*, 451 F.3d 585, 591–94 (10th Cir.2006); *United States v. Kandirakis*, 441 F.Supp.2d 282, 285–302, 318–329 (D.Mass.2006); Michael W. McConnell, *The* Booker *Mess*, 83 Denv. U.L.Rev. 665, 677–80 (2006). It suffices here to note that remedial *Booker* essentially enacts a federal sentencing system that Congress never intended, a result apparently deemed necessary as a stop-gap to avoid tossing out the statute together. The Supreme Court itself recognized as much and invited Congressional intervention, stating the ball was now "in Congress' court." *Booker*, 543 U.S. at 265, 125 S.Ct. 738.

All this happened in 2004. For a variety of reasons, since then, Congress has done nothing either to shore up or to revise the stop-gap system devised in remedial *Booker*.

It has thus been left to the Supreme court to explain and refine the sentencing system it created in 2004. It has done so with commendable clarity. In *Cunningham v. California*, 549 U.S. —, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), the Supreme Court invalidated California's advisory guidelines system, a system intellectually indistinguishable from the remedial *Booker* advisory guidelines. 127 S.Ct. at 866 n. 10. While the majority opinion expressly eschewed applying to its own remedial *Booker* system the language it forcefully applied to California's cognate statutory system, the *Cunningham* constitutional analysis leaves little doubt that federal district judges themselves are free to re-establish America's juries as the centerpiece of criminal law fact-finding. *Cunningham*, 127 S.Ct. at 869–71 (attacking California Supreme Court's comparison of state procedure to federal advisory guidelines); *see United States v. Griffin*, 494 F.Supp.2d 1, 13–15 (D.Mass.2007) (discussing effect of *Cunningham*), *aff'd in part*,

*vacated in part on other grounds,* 524 F.3d 71 (1st Cir.2008); *cf. Martin,* 520 F.3d at 91 (stating that sentencing court should not consider substantial variances from guidelines "beyond the pale"). This is what I've done routinely since early 2004, without difficulty and without incident. *United States v. Birkett,* 501 F.Supp.2d 269, 276–279 (D.Mass.2007) (applying such procedures post *Rita v. United States,* 551 U.S. ——, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)); *Kandirakis,* 441 F.Supp.2d at 318–29 (explaining this Court's procedures in detail); *see Richardson,* 477 F.Supp.2d at 402–06 (explaining procedures on re-sentencing).

In *Rita,* the Supreme Court eased the burden of reasonableness review on the courts of appeal by establishing a rebuttable appellate presumption of reasonableness for district court sentences that fall within a properly established advisory guidelines range. 127 S.Ct. at 2463–65. Concurring, Justices Scalia and Thomas cited this Court's emphasis on jury fact-finding as exemplifying a proper method of establishing the factual basis for the advisory guidelines calculation. *Id.* at 2479–80 & n. 5 (Scalia, J., concurring).

Most recently, in *Gall v. United States,* 552 U.S. ——, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), and *Kimbrough v. United States,* 552 U.S. ——, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), the Supreme Court made it unmistakably clear that, under its remedial *Booker* advisory guidelines system, the sentencing guidelines are just that, guidelines. *Kimbrough,* 128 S.Ct. at 570; *Gall,* 128 S.Ct. at 596–97. The district courts are free to accept or reject the Sentencing Commission's advice even as to its policy positions. *Kimbrough,* 128 S.Ct. at 570. What necessarily is required is case specific, nuanced analysis, faithful to the statutory objectives set forth in 18 U.S.C. § 3553(a), which are mandatory not

advisory. *See id.* at 574 (requiring consideration of § 3553(a) factors); *Gall,* 128 S.Ct. at 597 (stating failure to consider § 3553(a) factors a "significant procedural error"); *see also* Kalar & Sands, *supra,* at 23.

We apparently have come full circle. Justice Breyer's original conception has triumphed intellectually as the guiding principle of our Supreme Court-created advisory guidelines sentencing system.

## V. DEBRIS FROM THE PAST

For seventeen years, the unconstitutional mandatory guidelines system held sway throughout all ninety-four federal district courts and was thought to bind all 674 federal district judges. Moreover, this unconstitutional statute was germane not to some small slice of the district courts' jurisdiction; it instructed and distorted the entire criminal justice system. Virtually daily over the seventeen-year period, federal district judges took pleas (unconstitutionally) and imposed prison sentences (also unconstitutionally) upon thousands and thousands of offenders. In 2004, that stifling mantle of unconstitutionality was lifted in *Booker. See Booker,* 543 U.S. at 243–44, 125 S.Ct. 738.

But old habits die hard. Removing America's juries for seventeen years from their constitutionally mandated central fact-finding role in our criminal justice system has introduced multiple distortions and dis-connects in the roles juries, judges, prosecutors, and defense counsel play in reaching out for justice. Among these are the effects of sentencing disparagement and delay on the proper functioning of federal sentencing.

As the case at bar illustrates so well, the continuing malign influences of disparagement and delay still need to be addressed, even after remedial *Booker.* I mean to do so.

First, however, I must candidly acknowledge my own complicity in contributing to these continuing problems.

## A. Disparagement

In thirty years of judicial service, I am aware of no other congressional enactment that has been the subject of more consistently withering criticism than the Sentencing Reform Act of 1984 once it morphed into "mandatory guidelines." *See, supra*, pp. 76–77. Not a single state has embraced the complexities of the federal system; indeed, more often than not the mandatory federal sentencing guidelines were looked upon with derision by the several states. Not a single state has ever adopted the unworkable "relevant conduct" approach to sentencing found in the federal guidelines. *Green*, 346 F.Supp.2d at 269; *see* Richard S. Frase, *State Sentencing Guidelines: Still Going Strong*, 78 JUDICATURE 173, 176 (1995).

I have raised my own voice along with the other critics. A mandatory system so dysfunctional, so arbitrary, so unfair, and so unjust seemed to require candid criticism. To do less appeared to me a dereliction of duty. I emphatically agreed with the conclusion of commentators that "[t]he judge who conducts the sentencing is now, by design, little more than the instrument of a distant bureaucracy." KATE STITH & JOSE A. CABRANES, FEAR OF JUDGING 84 (1998).

Yet for all that it may have contributed to positive change, the constant drumbeat of criticism carries its own costs—and, as the present case illustrates, those costs are at times unacceptable.

## B. Delay

I commenced my judicial service as justice of the Massachusetts Superior Court, one of America's great common law courts of general trial jurisdiction. *In re TJX Cos. Retail Sec. Breach Litig.*, 527 F.Supp.2d 209, 214 (D.Mass.2007). Judges in that court followed one significant procedure when sitting criminal that is especially important here. Allowing for individual variations, most judges sentenced offenders on the day the jury returned a guilty verdict, on the next day, or at most a few days thereafter. Such a practice properly emphasizes and validates the jury verdict. It unmistakably indicates that it is the verdict of the people upon which the sentence of the court rests. It most closely ties the deprivation of liberty which may follow to that verdict. I learned then—and continue to believe—that this practice best vindicates the democratic aspects of our jury system.

It is, however, not without flaws.

Its chief drawback stems from the fact that a judge who sentences so promptly usually knows little about the offender as a person other than his criminal history, if any. While these matters are, of course, addressed during the sentencing hearing, it was my experience that there was little time or capability to check and reflect on factual assertions there made.

### 1. The pre-sentence report

All this became apparent when I transferred over here to the United States District Court for the District of Massachusetts in 1985 (pre-mandatory guidelines). As long as I've been here, our skilled and extraordinarily professional Probation Office prepares an extremely detailed pre-sentence report (sometimes running fifty pages or more) in which it provides a wealth of information about the offender's personal history, family circumstances, financial history, circumstances of the offense, disposition and status of co-defendants, and the like. Insofar as our dedicated probation staff is

able, this information is independently verified. All this takes time—twelve weeks is our current average. So helpful is the data in the pre-sentence report that today, after twenty-two years service, I can scarcely imagine sentencing without it.

Then came unconstitutional mandatory guidelines and today, even after three years of advisory guidelines, it appears I may be the slowest judge in the United States in imposing a criminal felony sentence.[2]

Why? Once it became clear that the "guidelines" were functionally mandatory, I never met a reason for sentencing delay I did not like. Let me count the ways:

## 2. Co-operation

Unlike Massachusetts' prosecutors who, in the main, make their cases without the use of informants, federal prosecutors routinely seek to "flip" those facing long prison terms into working for them as informants against other wrongdoers in hopes of a reduced sentence. One can hardly question the efficacy of such procedures, but they create a host of particular problems. Congress, for example, has mandated that, save for extraordinary circumstances, a defendant who pleads guilty to a

drug offense is to be taken immediately into custody. *See* 18 U.S.C. § 3143(a) (2006). In the case of cooperating drug defendants, however, the extraordinary has become routine. Such individuals are frequently left on the streets to chat up former acquaintances so that the government can "make" other cases. Sentencing delay is the inevitable consequence of this symbiotic relationship. The government wants to avoid sentencing until it has squeezed each informant completely dry and the defendant equally seeks to postpone the day of judgment so he can marshal the strongest possible record of cooperation in hopes of leniency.

Since the sentencing hearing is necessarily separated from the jury verdict by the three months necessary to prepare a pre-sentence report, I have been unable to discern a compelling public interest beyond judicial efficiency in refusing to allow the sentencing date to slide still further. Thus, where neither party opposes continuing the date of sentencing, I have routinely acquiesced.

## 3. Equal punishment for equal crimes

One would have thought this the central tenet of the sentencing guidelines. Yet

---

**2.** The District of Massachusetts is dead last among the ninety-four district courts in the United States in the median time it takes from filing to disposition of a criminal felony case (and this time has lengthened over each of the last six years). Administrative Office of the United States Courts, 2006 Federal Court Management Statistics 38 (2007) (hereinafter "Statistics"). In this context, however, "disposition" means the date of verdict or plea. AO Technology Training and Support Division, Criminal Statistical Reporting Guide, Data Entry Procedures—ver. 1.0 12/1996 at 3:32. This reporting system, although uniform among the district courts, markedly understates the time that actually passes from indictment to judgment. This understatement perhaps is similar to the Statistics' over-reporting of "trials," i.e. counting as a "trial"

every sort of evidentiary hearing. Young, *Vanishing Trials,* 40 SUFFOLK U.L.REV. at 87–88; AO Guide to the CM/ECF Monthly Trials and other Court Activity Report, Appendix A at 1.

The combination of this understatement of the length of time it takes to reach judgment in criminal cases and the Statistics' overstatement of "trials" furthers the mistaken impression that jury trials play a significant role in our criminal justice system. In fact, that system continues to be all about pleas, is slower than perceived, and continues to marginalize the American jury.

The conclusion that I am the slowest individual judge is my own inference drawn from the reflections in the text.

making the guidelines mandatory introduced striking sentencing distortions between those who pled guilty and cooperated · and those who exercised their Sixth Amendment right to trial by jury. *Berthoff,* 140 F.Supp.2d at 64–67; Timothy Lynch, *The Case Against Plea Bargaining,* REGULATION, Fall 2003, at 24, 26–27. The First Circuit's embrace of alternative realities, one for those who plead guilty and a strikingly different reality for those who exercise their constitutional rights, exacerbates this distortion in ways this Court at least considers constitutionally unacceptable. *Yeje–Cabrera,* 430 F.3d at 23; *Thurston,* 358 F.3d at 78; *Rodriguez,* 162 F.3d at 150–53. Rendering the guidelines advisory ameliorates this problem somewhat but does not eradicate it.

Delay is the most effective countermeasure to such unfairness.[3] By delaying the sentencing of pleading codefendants until the completion of the trial and sentencing of a defendant who invokes his constitutional rights, a judge can insure that no undue burden is placed upon the exercise of those rights. This is precisely the procedure detailed in *Kandirakis.* 441 F.Supp.2d at 285 & n. 10. It is fair and just—but slow, sometimes exceeding slow.

### 4. Three strikes laws

Three strikes laws impact federal sentencing in two ways—through the Armed Career Criminal Statute (mandatory) and the career offender guidelines (advisory). 18 U.S.C. § 924(e) (2006); U.S. Sentencing Guidelines Manual § 4B1 (2006) [hereinafter U.S.S.G.]. Like all three strikes laws, these enactments provide for substantially increased punishments for those who have certain prior convictions and yet have not reformed their ways.

At first, I gave little thought to the draconian outcomes mandated by these laws (the "guidelines" were at that time mandatory). They expressed a rational, albeit severe, policy choice and I rather mechanically applied them wherever appropriate.

Then the First Circuit erroneously held in *Brackett v. United States,* 270 F.3d 60 (1st Cir.2001), *abrogated by Johnson v. United States,* 544 U.S. 295, 125 S.Ct. 1571, 161 L.Ed.2d 542 (2005), that, even if one of the previous "strikes" was later called a "ball," the district judge, her powers restricted by the one-year habeas limitation in the Antiterrorism Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996), was stripped of jurisdiction to go back and reconsider the now excessive sentence.[4] *See Brackett,* 270 F.3d at 68 (holding vacatur of state conviction not discoverable fact from which statute of limitations begins to run). This, of course, works a stunning *injustice* on a defendant, a point I tried to make in my decision that led to the First Circuit's review in *Brackett. Gonzalez v. United States,* 135 F.Supp.2d 112, 125 (D.Mass.), (discussing "harsh" outcome of AEDPA on Brackett's petition), *aff'd sub nom. Brackett,* 270 F.3d at 60. Nevertheless, such was then "the law" and I obeyed.

Here again, the only fair and effective countermeasure was delay in sentencing—delay which would allow a defendant facing a three strikes sentence before this Court

---

**3.** Delay sometimes serves to avoid potential unfairness in civil cases as well. *See generally Winters v. Stemberg,* 529 F.Supp.2d 237 (D.Mass.2008).

**4.** As the Supreme Court noted in its introduction to *Johnson,* at least one other Court of Appeals lined up with the First Circuit on the issue, although the disagreement presented by the Fourth Circuit's position posed a circuit split worthy of certiorari. 544 U.S. at 302, 125 S.Ct. 1571.

to mount and exhaust a collateral attack on the prior state court convictions that would so markedly drive up the impending federal sentence. As this seemed to be the only way around a potentially unjust sentence, I routinely and reflexively allowed continuances for sentencing hearings upon the representation that the prior state convictions were under attack.

On April 4, 2005, the Supreme Court brought an explicit end to the need for any such delay with its decision in *Johnson,* which reversed the erroneous First Circuit precedent in *Brackett* and held that a defendant who vacates a prior state conviction used to enhance a federal sentence can seek re-sentencing provided he acts with reasonable promptness.[5] *See Johnson,* 544 U.S. at 298, 125 S.Ct. 1571. Although I soon became aware of the *Johnson* decision, through bureaucratic inertia I never altered my internal practices—until the present case demonstrated their ineptness.

## VI. THE PRESENT CASE: Sentencing Matthew West

### A. Investigation[6]

Matthew West ("West") is a small-time hoodlum caught up in a much more extensive federal investigation of alleged police corruption. Together with a thoroughly corrupt police officer, Roberto Pulido ("Pulido"), West ran an unlicensed after-hours bar and strip club rife with prostitution. Looking to get the goods on Pulido (and perhaps other officers), the F.B.I. used an undercover informant to solicit West, seeking to purchase cocaine. Although West denied dealing drugs, he readily agreed and, on two occasions, sold the informant small quantities of cocaine amounting, in the aggregate, to 17.6 grams.

Prosecutors now had West where they wanted him. As a career offender, if convicted of these two drug sales he faced a draconian sentence under the advisory guidelines. Perhaps he could be "flipped" and induced to cooperate in the investigation of Pulido and perhaps others. As it turned out, he could not.

### B. Trial and Pre-sentence Report

On September 13, 2006, a federal grand jury indicted West on two counts of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). West exercised his Sixth Amendment rights, and a jury returned a guilty verdict on both counts.

Following the conviction, the Probation Office prepared a Pre-sentence Investigation Report (PSR). The United States Sentencing Guidelines set the base-level for West's offense at twelve. PSR at ¶ 29. With little or no criminal history, West's advisory guideline range would have been ten to sixteen months. U.S.S.G., Sentencing Table (2006). The PSR revealed, however, that in 1992, at the age of twenty-two, West pleaded guilty in a Virginia state court after selling 8.48 grams of cocaine to an undercover officer. PSR at ¶ 45. In 2001, West pleaded guilty in the Roxbury District Court to assault and bat-

---

**5.** The United States Attorneys Office has recently begun inserting express waivers of this right to re-sentencing in its plea agreements. While this Court expresses no opinion on the effectiveness of such waivers, it notes that the power to re-sentence is one conferred upon the district court by the defendant's application in circumstances where the court's original sentence was misinformed by the presence of an improper (usually unconstitutional) prior conviction.

**6.** This recitation of facts is drawn from presiding over the trial. The facts, of course, are presented in the light that supports the jury's verdict. *See United States v. Staula,* 80 F.3d 596, 599 (1st Cir.1996).

tery on a Boston police officer, an offense that qualifies as a crime of violence for the purposes of the career offender statute, U.S.S.G. § 4B1.1. *Id.* at ¶¶ 37, 46. These two convictions brought West's criminal history within the ambit of U.S.S.G. § 4B1.1, which provides:

> (a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. Under the advisory guidelines, the career offender classification carried a twenty-two-level enhancement and automatically placed West into criminal history category VI. PSR at ¶ 49. With an adjusted offense level of thirty-four, the advisory guidelines suggested a sentence of 262 to 327 months. *Id.* at ¶¶ 38, 100.

### C. The Sentencing Hearing

■ On the morning of West's sentencing, his counsel notified the Court that West was no longer a career offender under the federal sentencing guidelines because his 2002 Massachusetts assault and battery conviction had just been vacated by Justice Diane Moriarity of the Roxbury District Court. The transcript of this ex parte hearing[7] (held in the Quincy District Court) is attached as Appendix A since it informs this Court's institutional response.

Blindsided, the government requested a brief continuance and this Court allowed it. The United States Attorney then publicly blasted the state court action and that same afternoon Justice Moriarity reinstated West's Massachusetts conviction. *See* Shelley Murphy, *Judge:* [sic] *Reverses Herself on Conviction—Prosecutors Fought to Have Defendant Face Tougher Penalty,* BOSTON GLOBE, Oct. 10, 2007, at 1B.

When the sentencing hearing reconvened, the government requested a sentence of 262 months imprisonment. Sent. H'rg Tr., Oct. 10, 2007, at 41:19–21. The government cited the seriousness of West's prior offenses and highlighted the importance of deterring repeat offenders. *Id.* at 38:11–16. In addition, the government emphasized that West had been arrested as part of an F.B.I. investigation into alleged criminal activities of Roberto Pulido and other allegedly corrupt Boston police officers. PSR at ¶ 9. Although not a police officer, West was an associate of Pulido's, and, along with Pulido, ran after-hours parties with drugs, unlicenced alcohol sales, and the illicit performances of female strippers. *Id.* West sold cocaine to a cooperating government witness on two separate occasions in connection with these illegal parties. *Id.* at ¶¶ 14–16. Each transaction was recorded with audio/visual equipment and the deals included a total of 17.6 grams, or about $750 of cocaine. *Id.* at ¶¶ 14, 16, 28. In addition, the government pointed to West's involvement in an alleged identity theft scheme perpetrated by Pulido. *Id.* ¶¶ at 10–12.

West asked for a significant downward departure, maintaining that his restored

---

**7.** Although West's counsel contested this Court's characterization of the proceeding as ex-parte, the transcript reveals that no representative of the Commonwealth entered an appearance or spoke during what appears to be a fairly informal conversation between West's counsel and Justice Moriarty. *See generally* Hr'g Tr. of Mot. to Vacate [Doc. No. 38–5], *Commonwealth v. Matthew West,* No. 0102CR2402 (Mass.Dist.Ct. Sept. 24, 2007) (hereinafter "H'rg Tr. of Mot. to Vacate").

career offender classification drastically over-represented his criminal history. *See* Sent. H'rg Tr. at 15:21–23:12. Notwithstanding its reinstatement, West asked the Court to overlook the 2002 conviction and treat West as an offender in criminal history category III, rendering an advisory guidelines range of 15–21 months. Def.'s Sent. Mem. [Doc. No. 37], at 1, 3–4. Although the matter will be discussed in greater detail below, the state court proceedings did not affect the Court's advisory guideline calculation or sentence in any way.

After hearing extensive argument and carefully considering the 18 U.S.C. § 3553(a) factors, the Court sentenced West to a term of 180 months imprisonment to be followed by 120 months of supervised release. It was quite clear from the evidence at trial that the circumstances surrounding West's arrest placed him outside the heartland of offenders caught dealing cocaine. West's drug dealing took place while he was helping run parties that were a veritable beehive of criminal activity. Moreover, while West was not charged with identity fraud or involvement of any of Pulido's alleged schemes, it was apparent from West's behavior in this case and his criminal history—which included a previous conviction for dealing cocaine—that his involvement with these parties, the identity theft scheme, and these unscrupulous characters was by no means coincidental.

In addition, the government's argument about the need to deter career offenders resonated with the Court. Nevertheless, the Court chose to impose a sentence below the government's recommended low-end guideline sentence of 262 months for two reasons. First, although West was a repeat offender, the Court was not convinced that drug-dealing was West's main line of business. Second, West's conduct and criminal history—while clearly warranting a lengthy period of incarceration—did not merit what could amount to a life sentence for a thirty-eight year-old man. The Court was thus satisfied that a fifteen-year sentence properly served the interests of justice.

West was sentenced as an individual. The term of imprisonment he received was guided by the dictates of Congress and based on the characteristics of his offense and his criminal history. It was a fair and just sentence. Nothing more need be said of Matthew West. I say this only to emphasize that nothing in the following section had any effect whatsoever on West's sentence.

## VII. INSTITUTIONAL ISSUES

West's counsel sought an order vacating West's 2002 assault and battery plea. A justice of the district court of the Commonwealth issued the order after a brief ex parte proceeding, and that same justice overturned the ruling on the eve of West's re-sentencing. As the record reveals, this maneuver was concocted to circumvent the federal career offender classification and, thereby, significantly to reduce West's advisory guideline range. *See* Def.'s Sent. Mem. at 1. The Court has thoroughly examined the record regarding the proceedings in the District Court of the Commonwealth. *See generally* H'rg Tr. of Mot. to Vacate. The Court will not comment on those proceedings in any detail because Massachusetts is a separate sovereign, and there is but a narrow set of circumstances that require this Court to review a matter in the Massachusetts district court. Nevertheless, I feel compelled to reflect on the state court proceedings as well as the developments in federal sentencing law highlighted in this case because they have brought about a change in this Court's sentencing procedures.

At the outset, I must confess that I am guilty of a stunning naiveté. I served as a justice of the Massachusetts Superior Court for eight years. During that time I took hundreds of pleas, and it never occurred to me that I had the power to set aside a plea in an ex parte proceeding in order to affect the outcome of proceedings of another court, much less the court of a separate sovereign. Indeed, it never occurred to me that a justice of the District Court of the Commonwealth would hold the federal criminal justice system in so little regard. It also never occurred to me that there could be such a deviation from the laws of the Commonwealth. I had always understood that the Massachusetts rules of criminal procedure did not permit a judge to vacate a plea based on a failure to advise the offender of all of the collateral consequences for that plea in future federal criminal proceedings. *See Commonwealth v. Shindell*, 63 Mass.App.Ct. 503, 505, 827 N.E.2d 236, *rev. denied*, 444 Mass. 1106, 830 N.E.2d 1088 (2005). Cognate federal jurisprudence reveals not so much as a suggestion that such a requirement is necessary to render a plea knowing and voluntary for purposes of applying the federal criminal offender guidelines.

## A. An End to Disparagement

Whatever the final result as to prior convictions in the courts of the Commonwealth, Appendix A reveals a striking disrespect for federal criminal adjudication. I must share some responsibility for this disrespect through my own longstanding criticism of mandatory federal sentencing guidelines. Accordingly, it behooves me to take a fresh look at these matters post-*Booker.*

Whatever the inconsistencies between constitutional *Booker* and remedial *Booker*; whatever its stopgap nature—the simple fact is that remedial *Booker* has given effect to a federal sentencing system that—with one exception, the role to be played by the jury, *see, infra,* section VII.B—today is as nuanced, balanced, and flexible in the interests of justice as at any time in my twenty-three years service as a federal district judge—a service that spans the pre-guidelines era and the entire unconstitutional mandatory guidelines period as well.

The time for disparagement is past. Today, as always, it is the *Congress* that defines through statute the conduct that constitutes a crime and sets the penalties therefore. Sometimes the sentence to be imposed is declared to be mandatory; in other cases, the sentencing range is left in the first instance to the judge presiding with certain constitutionally determinant upper limits. *See Griffin,* 494 F.Supp.2d at 19–20; *Kandirakis,* 441 F.Supp.2d at 321–23.

Within this broad framework, Congress has established the United States Sentencing Commission to provide detailed advice to the courts concerning an appropriate sentencing range for each subgroup of offenders who meet certain criteria. This is an important public function, one which I welcome since, in any national system, general equality among similarly situated defendants is an essential ingredient of our commonly shared concepts of justice. The statistical information supplied by the Sentencing Commission is itself invaluable. Its advice as the relevant criteria is likewise welcome. Whatever weight the judge ultimately ascribes to it, no judge could properly be so self regarding as simply to ignore the advice of the Sentencing Commission. This is as it should be.

Once again, as it has always been throughout the long history of our Republic, it is today the *judge* who bears the ultimate responsibility for fashioning an impartial, fair, and just sentence on a spe-

cific offender within the legal framework established by the Congress. Federal sentencing is a most important non-delegable duty imposed upon United States district judges. It is a core judicial function. This too is as it should be.

There is but one additional element that needs be added——the American jury.

## B. Renaissance of the American Jury?

From full partner of the judge, the indispensable ingredient in the power of the judge to adjudicate in a criminal case, the American jury today is regarded (even in those rare instances where one is empaneled) as nothing more than "the occasional visitors to criminal justice." AKHIL AMAR, THE CONSTITUTION: A BIOGRAPHY 236–39 (2005) (discussing balancing role juries perform); Ronald F. Wright, *The Power of Bureaucracy in the Response to* Blakely *and* Booker, 43 HOUS. L. REV. 389, 414 (2006) (noting jurors still lack sentencing power in *Booker's* wake).

> The modern jury is an anemic second cousin to that envisioned by the Founders. Once thought an engine of normative judgment, local wisdom, and democracy, today the criminal jury presides over a storytelling contest: it decides who presents the more logical or narratively satisfying account of "what happened." This erosion is lamentable, but not, perhaps, irreversible. The seeds of revival may be buried in the most obscure corner of modern Supreme Court jurisprudence: *Apprendi* and its progeny. *Cunningham* has advanced this agenda, but it does not go far enough. A jury verdict will meaningfully reflect the community's conscience and rein in an overly punitive legislature only when it is the product of knowledge, not ignorance, about sentencing.
>
> . . .

The Court's decision [in *Cunningham*] implicitly protects the role of the jury, so that the voices of individual citizens may serve as a check against the legislature when it diverges from the will of the people.

. . .

Justice Ginsburg's seemingly formalistic rejection of the dissenters' state-oriented and defendant-oriented models [in her opinion for the Supreme Court in *Cunningham*] may in fact signal the reemergence of an antiquated theory about one of the Sixth Amendment's purposes: to preserve meaningful citizen participation in the judicial process. According to this view, citizens in the jury box must affirm that statutory sentences, which derive their legitimacy from citizens acting as the electorate, are consistent with justice in the individual case. Such a view of the Sixth Amendment comports with both original intent and contemporary values and indeed would go a long way in restoring the criminal jury to its original luster.

. . .

Although she never directly addressed the issue, Justice Ginsburg provided at least one affirmative hint, albeit in a parenthetical, that the rights of the jury provided a normative principle behind her formalism. She quoted *Harris v. United States* paraphrasing *Apprendi*: "*Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime—and thus the domain of the jury—by those who framed the Bill of Rights." A Sixth Amendment scheme that focuses on statutory maximums would allow "the people" on a jury to serve as a check against "the people" of the electorate. According to this view, the Sixth

Amendment is not only about a defendant's right to a fair trial, but also about the right of the people to have the final word authorizing the imposition of their will as expressed through legislature.

Although now largely symbolic, the criminal jury's role as the voice of the community was once thought to be its essence. The very notion that facts are the province of the jury and law that of the judge is a relatively recent axiom. A verdict was thought to be more than a statement about *what happened*; it was a pronouncement of blame by the community on the individual.

. . .

The founding generation saw the jury as a check on governmental tyranny. The ascendancy of the criminal jury was one of the few examples of harmony between the Federalists and Antifederalists; both agreed that "the people" should have another check on government action in the criminal context, an area in which the government's power is at its apex. Thomas Jefferson placed jury trials above popular elections as instruments of democracy: "Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative."

Such a view of the jury as community conscience and check on tyranny may still exist in rhetoric, but it has disappeared from practice.

. . .

Among its other defects, [the] modern view of the jury relies on the fallacy that guilt and sentence are fundamentally different kinds of judgments. In the era before determinate sentencing, most crimes carried definite sentences. These sentences were common knowledge, and so a jury's verdict necessarily

expressed a judgment, although an implicit one, about whether the defendant deserved the punishment. Today, the link between verdict and sentence is more complicated, but still recognized. In *Apprendi*, [Justice] Stevens rejected the government's argument that since any guilty verdict makes the defendant subject to incarceration and social stigma, a sentence *enhancement* does not implicate the Sixth Amendment. Thus, a jury's determination of guilt was inevitably also a *judgment* about the charged behavior.

Since every juror can intuit that some consequence will flow from his verdict, he knows that his vote, although ostensibly only about what *has* happened, is as much about what *will* happen. Thus, when a jury returns a guilty verdict, it is making a de jure determination of guilt and a de facto determination of sentence, in that a sentence will be imposed. In so doing, the jury serves as a check on both the executive branch (by holding the prosecution to its burden of proof) and the legislative branch (by affixing a statutory sentence only if it serves justice in the individual case).

This latter role protects against the tyranny of the legislature, which is a very real threat in the case of sentencing.

Harvard Law Review, Comment, *Sixth Amendment—Allocation of Factfinding in Sentencing,* 121 Harv. L.Rev. 225, 225–26, 230, 231, 232, 233, 234–35 (2007) (excerpts rearranged, footnotes omitted).

This brilliantly incisive analysis limns the proper role of the jury in federal sentencing today. It is, in fact, the *jury* which, in our present quasi-determinant sentencing structure, ought establish the upper limit to a constitutionally reasonable sentence.

The procedures consistently followed by this Court since 2004 and in the case at bar, explained in *Kandirakis, Griffin*, and *Birkett* and expressly endorsed by Justices Scalia and Thomas in *Rita*, engage the jury in precisely the fashion intended by the Founders and required by *Apprendi* and its progeny. *Rita*, 127 S.Ct. at 2480 n. 5 (Scalia, J., concurring). These procedures are simple, fair, and constitutional.[8] They constitute the final element in a sound, effective, nuanced, and just approach to federal sentencing; the contribution of each must be acknowledged and respected. It is the district judge who can make this happen.

### C. Reduction in Delay

■ In *Johnson*, the Supreme Court overturned the rule set forth in *Brackett. Johnson*, 544 U.S. at 302, 125 S.Ct. 1571. The Supreme Court held that "the 1–year statute of limitations in 28 U.S.C. § 2255,-¶ 6(4) .... begins when a petitioner receives notice of the order vacating the prior conviction, provided that he has sought it with due diligence in state court, after entry of judgment in the federal case with the enhanced sentence." *Id.* at 298, 125 S.Ct. 1571. In other words, if one of the strikes relied upon to give rise to career offender status is later called a ball, then the offender has a year to request re-sentencing, so long as he has pursued his state claim with reasonable diligence. *See id.* Because the decision permits offenders to seek re-sentencing after this Court has imposed sentence, three-strike offenders need not rush to state court on the eve of sentencing gripped with the fear that eleventh-hour proceedings are their sole salvation.

Mindful that this Court today has greater freedom in sentencing, and mindful that *Johnson* has obviated any need for the practice I adopted in the wake of the First Circuit's *Brackett* decision, the Court announces the following change in procedure:

Although this Court may grant a continuance for a variety of reasons, it will not do so in order to allow an offender to revisit prior state court convictions. If at any point an offender obtains an order that would make re-sentencing appropriate, this Court will require genuine evidence about the nature of the proceedings in the state court. If the sentence has been vacated ex parte, the Court will give the state court proceedings such weight as is their due. It is the Court's hope that this practice will serve the ends of justice by encouraging offenders seeking vacatur to do so through adversarial proceedings in accordance with local rules.

### APPENDIX A

### Transcript

*Commonwealth v. Matthew West,*
No. 0102CR2402 Quincy

District Court, Courtroom A

Monday, September 24, 2007

Justice Diane Moriarty

[9:30 a.m.]

MORIARTY, J.: Yes?

COURT OFFICER: He wants to speak to you on a case, did you want to confirm it now before?

MORIARTY, J.: On a?

---

**8.** *Below* the upper limit of a constitutionally reasonable sentence (established by jury fact finding or the defendant's admissions during a plea), I make determinations of a factual nature upon which the actual sentence is based. This is precisely the point made by Justice Breyer writing for the Supreme Court in *Rita*. 127 S.Ct. at 2465–66. Indeed, the citations to *Blakely* and *Cunningham* there made confirm this interpretation.

COURT OFFICER: On a case with the D.A. that's pending?

DEFENSE: It's, actually it's an old case from Roxbury, Judge, and I apologize for bringing it here today, but it is a matter of a little bit of urgency, if you have a minute for me. This is a case from 2001 in Roxbury District Court that you presided over.

MORIARTY, J.: You're not going to expect me to remember this, correct?

DEFENSE: I know that you won't, Judge.

DEFENSE: You may, I tried to get to you last week and I understand that you were in training. And I appeared before Judge Wright in the Roxbury District Court on it—

MORIARTY, J.: Yeah.

DEFENSE: And he was inclined to act on the motion but he instructed me to speak with you. The papers are in Roxbury, but in sum, Judge, here's what the situation is.

MORIARTY, J.: I told him if he didn't plead guilty, he'd go to jail?

DEFENSE: No, the attorney, according to him—

MORIARTY, J.: Good. Okay.

DEFENSE: Here's what the situation is with respect to Mr. West, Judge. He is scheduled for sentencing today in the federal court in front of Judge Young. He was convicted several months ago after trial in the Federal District Court of possession with intent to distribute a small amount of cocaine. His case is an offshoot of the Boston Police corruption case involving Roberto Pulido. Mr. West was alleged to have hosted the unlicensed stripper parties, and the federal government believed that he maintained the guest list. They then selected him—well, my argument is they selected him for prosecution, a government witness solicited purchase of cocaine from him. He on two occasions sold a total of 750 dollars of cocaine to the government witness. They concluded the investigation with the Boston Police, and then came to see West. He admitted his involvement, but refused to cooperate. They subsequently indicted him and detained him, and he went to trial on that basis. Because of this plea in the Roxbury District Court, which was an assault and battery, he is subject to a career offender—

MORIARTY, J.: Who's the lawyer? Do you remember?

DEFENSE: The papers are there, I looked at it, I'm not sure who the lawyer was, Judge. It was bar counsel I think. But because of this conviction in the Roxbury District Court, his sentence guidelines go from 15 to 21 months to 262 months. Judge, you're—

MORIARTY, J.: This isn't—was not his only felony charge right? He's has previous—

DEFENSE: When he was 22 years old, he served time in Virginia for distribution of cocaine. This happened when he was about 35 or so—

MORIARTY, J.: Okay.

DEFENSE:—this assault and battery. He was trouble free, Judge, since his release from incarceration in Virginia.

MORIARTY, J: And how long did he do in Virginia?

DEFENSE: He got—he got a pretty heavy sentence. He sold, you know, four grams of cocaine to an undercover. He got ten years, was told he'd be paroled in eight months, but he did four years. When he got out, he then got a job at UNICCO Service Compa-

ny. He bought a home in Saugus. He's engaged to be married to Tatiana Hall. He's got a ten-year-old daughter and a one-year-old son that was born just after he was arrested on this. He—this case speaks to what's wrong with the federal sentencing guidelines, Judge, and I think Judge Young recognizes that. Judge Young ruled in a case that was decided in the First Circuit in 2006, *U.S. v. Teague,* that he concluded that even though a person was a career offender, that he should be sentenced according to the post-*Booker* statutory guidelines, and not be subject to what he called an excessive penalty. I think this is a similar case. And what I'm just trying to do is give Judge Young something to hang his hat on so he can sentence the defendant appropriately with the guideline provisions that apply to him. Essentially what happens is, because of this conviction, the government—

MORIARTY, J.: I know.

DEFENSE: Yeah.

MORIARTY, J.: I know.

DEFENSE: I didn't know—

MORIARTY, J.: But I didn't—I don't, did you get a copy of the colloquy?

DEFENSE: There's no audiotape of the colloquy.

MORIARTY, J.: Timmy Flaherty says I didn't do it right.

DEFENSE: Well—

MORIARTY, J.: I'm not sure about that. I always made sure that I did it.

DEFENSE: The one unusual thing on the docket, Judge, is that—

MORIARTY, J.: Is there a green sheet?

DEFENSE: There's a green sheet.

MORIARTY, J.: Yeah.

DEFENSE: But on the docket it says, "Colloquy given in court to defendant," and I don't usually see that in dockets. Which—and I don't know the reason for it. It was just unusual to me. So I don't—

MORIARTY, J.: Was that—that might have been the new clerk.

DEFENSE: Yeah, it could have been.

MORIARTY, J.: Do you know who the new clerk—we had a ton of new clerks come in Roxbury at the time, so I don't know—

DEFENSE: Essentially, Judge, the only basis—

MORIARTY, J.:—but the green sheet has my signature on it, right?

DEFENSE: I'm sure it does, yeah.

MORIARTY, J.: Mmmhmm.

DEFENSE: The only basis for the defendant moving to vacate the conviction is that he wasn't advised of the possible sentencing enhancement potential were he to plea to the assault and battery as a crime of violence. and essentially the facts are—

MORIARTY, J.: I mean, I don't have to give him that for something that might occur in the future. I only have to give him what he can do for state time, right?

DEFENSE: You might be right, Judge, you may be right, but—

MORIARTY, J.: Well, but the reason I'm asking you these questions is I just got turned over on doing this. They said I didn't make—I did the appropriate colloquy. I didn't have to ask them if they've had any drugs or alcohol. I didn't have to tell them that they might in the future have a problem with federal guideline sentencing.

DEFENSE: Mmmhmm.

MORIARTY, J.: Because I just allowed a motion to withdraw a plea in Chelsea based on similar—he also had I.N.S. problems, and the Appeals Court two months ago told me that I didn't have to do any of those things. That's what my problem is.

DEFENSE: Well in the interest of justice, Judge, I think you have discretion to vacate, and I would only suggest that the fact—

MORIARTY, J.: Except now you want to, hmm. What is the D.A.—Did you file with the D.A.?

DEFENSE: I did, yeah, Jonathan Tynes, the supervising D.A. over there—

MORIARTY, J.: What did he say?

DEFENSE: He says—

MORIARTY, J.: He didn't file an opposition, because, I tell you, they took me up in Chelsea.

DEFENSE: Yeah, he tells me that, for the record, what he would do is he would just object for the record, but he would not make a strenuous argument, and that's what his position was in front of Judge Wright. I think—

MORIARTY, J.: I wish I had evidence of that.

DEFENSE: Tynes and I have discussed this.

MORIARTY, J.: Yeah, I know.

DEFENSE: I can give you the sentencing guide—the pre-sentence report on Matt West. I have a copy of it with me where they go through the whole thing.

MORIARTY, J.: Yeah, let me take a look at it. I don't like to do this. I'm looking at this, this was an easy sentence for me. 90 days suspended.

DEFENSE: I know, Judge.

MORIARTY, J.: Six months probation.

DEFENSE: He completed—he got anger management, completed—I mean, you understand what they're doing with this kid.

MORIARTY, J.: I do. What information were they looking for that he wouldn't give them?

DEFENSE: Who the other cops were at the parties.

MORIARTY, J.: The other cops? They're going to find that out anyways.

DEFENSE: They've got it all audio and videotaped. What they did was, they came to him and they said, "Look. You're going to do 25 years—

MORIARTY, J.: Why didn't he just give it to them?

DEFENSE: He's not that type of guy, Judge. He wouldn't tell them—essentially—

MORIARTY, J.: Someone was going to give it to them.

DEFENSE: What happened—and the facts were produced at trial. What happened essentially is that the government witnesses solicited him on a couple of occasions. We didn't interpose an entrapment defense at trial because it wouldn't fly with his record.

MORIARTY, J.: Yeah. Yeah.

DEFENSE: But essentially he asked him, can you get us some party favors? And he said, with the girls? I don't do that, that's up to you. And then the informant touched his nose, and my client responded on the audiotape, you mean powders? Well, I can't do that, but I can network it for you. So essentially, the evidence against him is, he received some cocaine from an unidentified person and refused to give the source to the government. He handed it over to the

informant, and transferred the money back to the source. And for that he's facing, you know, essentially 22 years. And that's—you know, they were looking for him—my first conversation with the AUSA was, they would recommend—

MORIARTY, J.: Was this straight assault and battery on mine?

DEFENSE: He was—there was assault and battery, maybe disorderly—

MORIARTY, J.: It's assault and battery, malicious destruction of property over.

DEFENSE: Yeah.

MORIARTY, J.: So it;'s the malicious destruction of property over that's the problem for you?

DEFENSE: No, I think it's the assault and battery, Judge. A crime of violence—

MORIARTY, J.: Even though it's a misdemeanor?

CLERK: I was just going to say, it's a misdemeanor.

MORIARTY, J: It's a misdemeanor, right?

DEFENSE: I think it's—

MORIARTY, J.: It's not the—

DEFENSE: It qualifies as a crime of violence. I mean I would ask you to vacate—

MORIARTY, J.: Is that what the issue is? You think—

DEFENSE: I believe it's—

MORIARTY, J.: Because, see, I thought it was all felony stuff that triggered the sentencing.

DEFENSE: The way the career offender enhancement section reads, it's two prior felony convictions—

MORIARTY, J.: Right.

DEFENSE: Either one for drugs and one for violence, or two of each, and this assault and battery, I believe, qualifies as a predicate offense for a crime of violence, even though—

MORIARTY, J.: It's not a felony.

DEFENSE: Yeah.

MORIARTY, J.: Because it's not a felony.

DEFENSE: Not in Massachusetts it's not a felony, but I think it's regarded for purposes of career offender enhancements as a felony conviction, or crime of violence that satisfies the predicate. The facts of this case, the assault and battery conviction, were that he and his fiancée were parking a car in Roxbury, and—

MORIARTY, J.: It was a domestic case.

DEFENSE: Well, essentially what happened was, they bumped a—the presentence makes it look like domestic but it wasn't. They bumped a bumper of a car in front of them and the guy in that car came out and came after the fiancée. West intervened. A neighbor called the police to defend West, because there was a social club across the street. A bunch of guys piled out, and when the cops arrived there was more yelling and shouting. West got locked up. Tatiana was pushing a cop. And, you know, it was one of those things.

MORIARTY, J.: Well, I'm just looking—he's the got the juvenile stuff, he was convicted, but he's got an ABPO in Cambridge.

DEFENSE: But it's beyond the—it's beyond the applicable time provisions because it's—the career offenders go back only ten years for the enhancements. So the ones that count are the most recent: Virginia and Suffolk.

MORIARTY, J.: This '92 one?

DEFENSE: According to—

MORIARTY, J.: Ten years?

DEFENSE: But he was released—

MORIARTY, J.: Yeah, I see that.

DEFENSE: You see where he was released in 1996. So it's just within the ten-year time period.

[extended period of silence]

MORIARTY, J.: They didn't charge him with ABPO. Right?

DEFENSE: Yeah they didn't, and it was—

MORIARTY, J.: Which is really what it sounds like it was.

DEFENSE: Right. And I think—I'm not sure if they were originally charged that way and then they reduced it, but that recitation of facts doesn't read the same way the police report does. The police report is, oddly enough, not as bad against the defendant as the recitation by the probation officer is. The police report, you know, says that he was flailing about, and then it's almost an admission of excessive force because they did kind of bundle him and mace him repeatedly, and then when he was in the cell area he refused medical treatment but he was obviously in agony, and that's when he was—

MORIARTY, J.: So if this is reduced, what does he get? Do you know?

DEFENSE: Yeah, he does 15 to 21 months. The—let me get the sentencing memorandum.

MORIARTY, J.: 15 to 21 months?

DEFENSE: The guidelines call, well, I mean it's discretionary—

MORIARTY, J.: I know. Who's was the sentencing judge?

DEFENSE: Young.

MORIARTY, J.: Well, Young won't give him the lower end.

DEFENSE: Well, he'll give him something less than 262 to 327. Young tried the case—

MORIARTY, J.: Right. So he knows. And what's the government asking for?

DEFENSE: Well, they're looking for the current enhancement of 262 to 327. And frankly, Judge, in my conversation with—

MORIARTY, J.: Do you have, it that what they asked for?

DEFENSE: That's what they're going to ask for today. The AUSA keeps calling me saying have you been able to—he said, I know you're not going to vacate Virginia, but have you done anything in Mass., and I said, well, we're still working on it. I think he frankly, Judge, is uneasy with this. I think everyone's uneasy with it.

MORIARTY, J.: Well, when this goes up they're going to overturn me, you understand that?

DEFENSE: I don't think they're going to appeal it.

MORIARTY, J: It was the same office.

DEFENSE: Not the same D.A.

MORIARTY, J: I hope you're right about that.

DEFENSE: I think I am.

MORIARTY, J: Because now they're going to try it all over again. That's not going to make them happy. Right?

DEFENSE: He'll plead, right after he's sentenced.

MORIARTY, J.: He will?

DEFENSE: He'll plead to committed time on advice and instruction of counsel.

MORIARTY, J: Okay. [writing] Tell him it was an early Christmas present.

DEFENSE: You are a just and wise woman.

MORIARTY, J: [laughs]

DEFENSE: [laughs]. Thank you.

MORIARTY, J.: You're welcome.

DEFENSE: Matt West thanks you.

[9:51 a.m.]